E-FILED
Thursday, 10 October, 2019  03:23:27 PM
Clerk, U.S. District Court, ILCD

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of Illinois

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The apartment located at<br>301 Meadow Avenue, Apartment 3<br>East Peoria, Illinois 61611 | )<br>)<br>)<br>)<br>)<br>)  Case No. 19-MJ- 6097 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attchment A.

located in the _____ Central _____ District of _____ Illinois _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attchment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to distribute oxycodone |
| 21 U.S.C. § 841(a)(1) | Distribution of oxycodone |
| 18 U.S.C. § 1956 | Conspiracy to commit money laundering |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Austin Love

_____
*Applicant's signature*

Special Agent Austin Love, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
*email & telephone*
*(specify reliable electronic means)*

Date: 10/10/2019

City and state: Peoria, Ill.

s/Jonathan E Hawley

_____
*Judge's signature*

Jonathan E. Hawley, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Description of location to be searched

The location to be searched is 301 Meadow Avenue Apartment 3, East Peoria, Illinois 61611. The TARGET LOCATION is north of Meadow Avenue and east of Field Avenue. The TARGET LOCATION is beige in color, with black and white trim. Apartment 3 is one of twelve apartments and is located approximately mid-way down the west side of the driveway.

The exterior of the TARGET LOCATION is pictured below:



1

A map of the TARGET LOCATION is pictured below:



## ATTACHMENT B

### ITEMS TO BE SEIZED FROM THE TARGET RESIDENCE

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 21, United States Code, Sections 846 and 841(a)(1) and Title 18, United States Code, Section 1956(h):

1. Controlled substances, cutting agents, precursor chemicals, scales and any other drug paraphernalia.
2. Packaging material, priority mail envelopes, shipping labels, and tracking numbers.
3. United States currency, financial instrument(s), precious metals, jewelry and other items of value and/or proceeds of drug and money laundering transactions.
4. Any firearms, ammunition, silencers, explosives, incendiary devices, or other dangerous weapon.
5. Indicia of ownership or control of the location.
6. Mail or mail items sent to Darryl McGinty addressed to a USPS post office box.
7. Records, ledgers or other paperwork that contain customer lists, calculations, accounts or any other evidence of drug and money laundering transactions.
8. Computers, electronic mobile device, or storage media used as a means to commit the violations described above.
9. For any computer, electronic mobile device, or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):
   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;
   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

1

of the presence or absence of security software designed to detect malicious software;

c. evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

d. evidence related to the access of the dark web, including Dream Market;

e. evidence of Bitcoin ownership;

f. seizure of virtual currency;

g. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

h. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

i. evidence of the times the COMPUTER was used;

j. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

k. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

l. records of or information about Internet Protocol addresses used by the COMPUTER;

m. evidence indicating the use of Wickr and communications on Wickr;

n. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

o. contextual information necessary to understand the evidence described in this attachment.

10. Routers, modems, and network equipment used to connect computers to the Internet.

11. During the execution of this search warrant, the law enforcement personnel are authorized to forcefully depress the fingerprints and/or thumbprints of the person identified as DARRYL MCGINTY, who is located at the TARGET LOCATON, during the execution of the search and who is reasonably believed by law enforcement to be a user of a

2

fingerprint sensor-enabled device that is located at the TARGET LOCATION, and falls within the scope of the warrant, onto the fingerprint sensor of the device (only when the device has such a sensor) in order to gain access to the contents of any such device.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Austin Love, Special Agent of the Drug Enforcement Administration ("DEA"), being duly sworn, hereby state as follows:

### I.  INTRODUCTION AND AGENT BACKGROUND

1.       I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.       I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been so employed since January 2012.  I am currently assigned to the DEA Miami Field Division, Counternarcotic Cyber Investigations Task Force which is responsible for investigations where computers, networks, telecommunication devices, and other technological instruments are the vehicle for the distribution of illegal drugs and/or drug-sale proceeds.

3.       Prior to my employment with the DEA, I was employed for approximately three years with the Department of Homeland Security, U.S. Customs and Border Protection, Office of Field Operations where I was a Customs and Border Protection Officer in San Francisco, California.

4.       I have received training in the enforcement of laws regarding controlled substances, as found in Title 21 of the United States Code.  I have attended the DEA's sixteen-week basic agent training academy in Quantico, Virginia, where I received specialized training in the methods and techniques used by individuals involved in drug trafficking.  I have conducted drug-trafficking and money laundering investigations, and I have debriefed and participated in the debriefings of defendants, informants, and witnesses who have participated in drug-trafficking activity.

5.      Through my training and experience, I have familiarized myself with the methods employed by drug traffickers in general to smuggle, safeguard, and distribute drugs, and to collect and launder drug-related proceeds. These methods, which are made in an attempt to avoid detection by law enforcement and to circumvent drug trafficking investigations, include the use of use of coded or vague communications, cellular telephones, computers, false or fictitious identities, counter-surveillance, and sophisticated schemes tied to legitimate businesses, to name a few.

## II.      PURPOSE OF AFFIDAVIT

6.      This Affidavit is made in support of an application for a search warrant for 301 Meadow Avenue, Apartment 3, East Peoria, Illinois 61611 (the "TARGET LOCATION"), as described more fully in Attachment A. The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 846 (Conspiracy to Distribute a Controlled Substance), Title 21, United States Code, Section 841(a)(1) (Distribution of a Controlled Substance), and Title 18, United States Code, Section 1956(h) (Conspiracy to Commit Money Laundering), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

7.      The facts set forth in this Affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.

2

## III.   FACTS SUPPORTING PROBABLE CAUSE

8.      This application stems from an ongoing criminal investigation into vendors who facilitate drug trafficking occurring on the dark web. Dream Market is one of many criminal marketplaces that have operated on the dark web. Starting in 2013, Dream Market has facilitated the anonymous sale of illegal items, such as controlled substances, in exchange for bitcoin and other peer-to-peer crypto-currencies (also known as, virtual currencies).

9.      As a means to identify dark web vendors, DEA agents created an undercover virtual storefront on Dream Market which acted as a mechanism to liquidate bitcoin into fiat currency[1]. Potential customers could utilize this undercover storefront to cash-out their bitcoin into United States (US) dollars minus a commission fee. The US dollars would then be mailed to the customers via the US Postal Service. In order for this service to work, customers would have to provide a legitimate shipping address along with the corresponding name so that their money would arrive, thus serving as the basis for identification.

10.     There are legitimate mechanisms to liquidate bitcoin into fiat currency which charge a much lower commission fee, however, these mechanisms generally require full identification and bank account details. Based on my training and experience, people utilize the dark web in order to remain anonymous and, therefore, want to give out as little identification as possible. Due to this, people started utilizing the aforementioned undercover storefront in order to cash-out their bitcoin.

11.     On September 28, 2018, DEA agents observed an order placed on the aforementioned undercover storefront by the moniker h2oisgreat. The order was for $1,000 US

---

[1] Fiat currency is currency backed by a central authority, such a government.

3

dollars to be mailed to an address provided by h2oisgreat via an encrypted message.  DEA agents

decrypted the message from h2oisgreat which contained the following:

> Darryl McGinty
> 301 Meadows Ave. Unit 3
> East Peoria, IL 61611

After DEA agents received this information, they reviewed law enforcememnt databases

and obtained an Illinois driver's license photo of McGinty with the same address provided

through the encrypted message.

      12.     On October 11, 2018, DEA agents sent a message to h2oisgreat on Dream Market

via the undercover storefront which stated the following:

> "Just wanted to let all my customers know, because of multiple requests we are now
> offering vendor discounts.  If you happen to be a vendor as well, let me know before your
> next order and I will make you a custom listing charging a lower rate."

      13.     Also on October 11, 2018, DEA agents observed a response back from h2oisgreat

on Dream Market which stated the following:

> "Very cool!. I am a vendor as well. My vendor name is thewaterisgood. I didn't get a
> chance to say thanks for the last transaction, but I really did appreciate your speed and
> communication. I will be using your service more and on a regular basis in the near
> future. Also will try to combine my orders and not have a lot of smaller ones.
> H2o!"

DEA agents then checked Dream Market and found a vendor page for thewaterisgood which had

multiple listings for oxycodone.  On October 15, 2018, DEA agents conducted an undercover

purchase from thewaterisgood on Dream Market for the listing advertised as "8 Real pharma 40mg

Oxycontin OC not OP! Read info."  The vendor posted a sale price of .0389 bitcoin for the

aforementioned listing which including shipping came out to .0403bBitcoin (approximately

$258.60).  Payment was to be made through the Dream Market escrow system.  The DEA agents

provided thewaterisgood with an undercover post office box address located in Miami-Dade

4

County, Florida. On October 22, 2018, DEA agents received a package in the undercover post office mailbox from "Dvd Bay, 312 S. Cedar St., Washington, IL 61571" which was sent via United States Postal Service Priority Mail. Inside the package were 8 oxycodone pills. DEA laboratory results confirmed it was oxycodone.

15.     From October 11, 2018 through January 25, 2019, DEA agents periodically reviewed thewaterisgood's active listings and captured screen shots. During this time, thewaterisgood had the following active listings: 8 oxycodone pills – 40mg (56 product ratings); oxycodone pills – 30mg (17 product ratings); oxycodone pills – 40mg (32 product ratings); 10 Adderal pills – 20mg (3 product ratings); Adderal pills – 20mg (3 product ratings).[2] The total amount of oxycodone pills sold during this time was approximately 497, and the total amount of Adderal pills sold during this time period was approximately 33.

16.     On January 10, 2019, law enforcement conducted surveillance at the TARGET LOCATION. Darryl McGinty departed the TARGET LOCATION in a white Hyundai Accent, which is registered to him, and then drove to a health clinic and then to a US Post Office. At the post office, McGinty was observed placing an unknown quantity of unknown items into a blue collection box. After leaving the United States Post Office, McGinty started conducting various surveillance detection maneuvers commonly referred to as "heat runs" at which point law enforcement had to terminate surveillance so they would not be spotted by McGinty. Based on my training and experience, I believe that McGinty mailed several parcels containing narcotics and then conducted heat runs in order to see if he was being followed by law enforcement.

17.     Thewaterisgood's profile page on Dream Market stated that he could be contacted

---

[2] A customer can only leave a product rating if it was a confirmed purchase by Dream Market. Therefore, each product rating is equivalent to one known sale.

5

via Wickr[3] at the username h2oisgreat. On June 26, 2019, law enforcement conducted surveillance at the TARGET LOCATION where they observed the aforementioned white Hyundai Accent parked in front of the TARGET LOCATION. Once surveillance was established, DEA agents acting in an undercover capacity, contacted h2oisgreat on Wickr and placed an order for seven pills of 80mg oxycodone and paid with bitcoin, which was worth approximately $289.00 US currency. DEA agents acting in an undercover capacity instructed h2oisgreat on Wickr to ship the oxycodone to an undercover post office box address located in Miami-Dade County, Florida. Subsequently, h2oisgreat responded via Wickr that he was "on way to box" and provided a United States Postal Service tracking number.

18.     A short time later, law enforcement observed McGinty exit the TARGET LOCATION. He was positively identified as the same individual as in the Illinois driver's license photo of Darryl McGinty. McGinty entered the aforementioned white Hyundai Accent, and drove to a United States Post Office where he parked in front of a blue collection box. Law enforcement observed McGinty deposit two parcels into the blue collection box and then drive away. A short time after McGinty departed the area, a United States Postal Inspection Service Inspector entered the blue collection box and retrieved the two parcels that McGinty deposited. One of the two parcels was addressed to the undercover name and post office box address located in Miami-Dade County, Florida, which had been previously provided to h2oisgreat on Wickr by DEA agents acting in an undercover capacity. DEA agents opened the aforementioned package which contained seven suspected oxycodone pills. DEA laboratory results confirmed it was oxycodone.

---

[3] Wickr is a mobile communication application that allows users to send encrypted, content-expiring messages. Through prior agent experience, I know that online dark web drug traffickers often utilize encrypted applications to communicate, such as the Wickr. This is a way for traffickers to feel more anonymous when conducting their online drug trafficking activity and a way to thwart law enforcement detection.

19.     On September 26, 2019, an Indictment was filed in the Southern District of Florida charging Darryl McGinty with one count of conspiracy to distribute a controlled substance, in violation of Title 21, United States Code, Section 846; three counts of distribution of a oxycodone, in violation of Title 21, United States Code, Section 841(a)(1); and, one count of conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

20.     Based on my training and experience, combined with the evidence gathered from this investigation, I believe that McGinty is operating his narcotic sales business from the TARGET LOCATION. I further believe that McGinty packages narcotics inside the TARGET LOCATION and that McGinty utilizes computers and/or other digital devices, to include cellular telephones, to facilitate his narcotic sale business. Based on my training and experience, I believe that McGinty accesses his digital devices while inside the TARGET LOCATION and such devices will be found inside the TARGET LOCATION.

## IV.   TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING OFFENSES

21.     Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.      Drug traffickers often store documents and other items relating to the possession, manufacture, importation, exportation and distribution of drugs and to the illegal proceeds of drug trafficking in their residences, stash houses, and cars where they are readily available and concealed from law enforcement. These documents and items include invoices, shipping labels, tracking numbers, boxes, and envelopes.

b.      Drug traffickers commonly store drugs and drug paraphernalia, including packaging materials, cutting agents, and manufacturing tools, in their residences, stash houses, and cars where they are readily available and concealed from law enforcement.

7

c.      Drug traffickers attempt to mask the distinct odors of particular drugs through the use of heat sealing and canning devices or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease. Drug traffickers also use several packaging layers when shipping drugs to decrease the odor.

d.      Drug traffickers keep books, receipts, notes, ledgers, and other records, either on paper or electronically, relating to their drug distribution activities. Because drug traffickers often "front" drugs to their customers - that is, sell the drugs on credit - or receive drugs from their suppliers on credit, such records are necessary to keep track of the amounts paid and owed by/to their customers and suppliers. These ledgers are more commonly known as "pay/owe sheets," and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets. "Pay/owe sheets" are frequently encoded in order to protect the identities of customers and suppliers. Drug traffickers often keep such records in their residences, stash houses, and cars.

e.      Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, gift cards, and other items of value, which are either the proceeds from drug sales or are intended for the purchase of drugs. When drug traffickers amass such wealth, they often attempt to conceal it and its origin from discovery by law enforcement. Drug traffickers use many different techniques to do so, including using digital currency, and using savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug traffickers also use drug proceeds to purchase real estate or cars, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug traffickers often use fictitious or "straw-holder" owners to conceal the true ownership of real estate, cars, or other valuable items

8

purchased with the proceeds of drug sales. In addition, drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution activities. Drug traffickers often keep these items of value, and records relating to them, in their residences, stash houses, and cars where they are readily available and concealed from law enforcement.

        f.     Drug traffickers go to great lengths to hide and secure the drugs, drug proceeds, other items of value, and records relating to their drug business. This is to safeguard those items against robbery and keep them hidden from law enforcement. Drug traffickers hide these items by storing them in secure locations, including safes, vaults, or other locked containers, as well as in specially-constructed concealed compartments that are often found in cars used for drug trafficking. Other methods of concealment include the burial of items underground, the use of locked cars, trailers, out buildings, sheds, and exterior closets, the use of natural spaces within walls, furniture, cars, and other areas, and the use of sealed cans and canning machines.

        g.     Drug traffickers often use USPS or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money throughout the United States. They do so, at least in part, because of the convenience of the service, the availability of internet and phone tracking services, the speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written air bills, drop the packages near closing time, pay for such services in cash, and use fictitious names, addresses, and telephone numbers to avoid detection by law enforcement. Drug traffickers frequently keep records relating to their use of these services, such as receipts, copies of air bills, empty and previously used boxes, packing tape, packaging materials, and package tracking records printed from the internet, in their residences, stash houses, and cars, where they are easily available for

reference.

h.      Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained in their residences, stash houses, and cars, where they are readily available and concealed from law enforcement. Moreover, such records are often stored electronically within the memory of telephones, computers, and personal digital assistants such as iPhone and Blackberry devices.

i.      Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline tickets, baggage stubs, frequent use club membership information, airline, rental car, and hotel receipts, credit card bills, photographs, videos, passports, and visas, are often kept by drug traffickers in their residences, stash houses, and cars where they are readily available.

j.      Drug traffickers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits and supply of drugs from others who might attempt to forcibly take such items and harm the drug traffickers during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically kept in their residences, stash houses, and cars where they are concealed from law

enforcement and readily available.

          k.      Drug traffickers often use two way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement. Such items are typically kept in their residences, stash houses, and cars.

          l.      Drug traffickers frequently take, or cause to be taken, photographs and videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs. Such items are often stored in their residences and cars, and on digital devices.

          m.      Drug traffickers often use electronic devices such as cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, tablets, email, and personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug traffickers often keep the documents and records described above on those devices. Drug traffickers often use multiple phones, including not only their own phones but also phones of family members and significant others, in order to avoid detection by law enforcement. Drug traffickers often keep these devices in their residences, stash houses, and cars where they are readily available.

## V.     TRAINING AND EXPERIENCE ON DIGITAL DEVICES

22.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended

for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

23.      Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

24.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

25.      The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte

12

of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

26.      Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

27.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.    Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

28.     Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because

14

the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

29.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

30.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the

15

warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

31.     As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I know from my training and experience and my review of publicly available materials that Apple Inc., Motorola, HTC, and Samsung, among other companies, produce devices that can be unlocked by the user with a numerical or an alpha-numerical password, or, for some newer versions of the devices, with a fingerprint placed on a fingerprint sensor. Each company has a different name for its fingerprint sensor feature; for example, Apple's is called "Touch ID." Once a user has set up the fingerprint sensor feature in the security settings of the device, the user can unlock the device by placing a finger or thumb on the device's fingerprint sensor. If that sensor recognizes the fingerprint or thumbprint, the device unlocks. Most devices can be set up to recognize multiple prints, so that different prints, not necessarily from the same person, will unlock the device. In my training and experience, users of devices with a fingerprint sensor feature often enable that feature, because it unlocks the phone more quickly than the entry of a passcode or password but still offers a layer of security.

32.     In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device. For example, with Apple, Touch ID will not work if (1) more than 48 hours have passed since the device has been unlocked, (2) the device has been turned on or restarted, (3) the device has received a remote lock command, or (4) five attempts to match a fingerprint have been unsuccessful. Other brands have similar restrictions. I do not know the passcodes of the devices likely to be found at the TARGET LOCATION.

16

33.    For these reasons, while executing the warrant, agents will likely need to use the fingerprints or thumbprints of MCGINTY of any fingerprint sensor-enabled device(s) to attempt to gain access to that device while executing the search warrant. The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of every person who is located at the TARGET LOCATION during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the TARGET LOCATION and falls within the scope of the warrant. The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the fingerprint sensor at the time of the search. Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

34.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

(This space intentionally left blank.)

17

## VI.   **CONCLUSION**

35.    Based on the foregoing, there is probable cause to believe that the evidence, fruits,

and instrumentalities of the offenses described in Attachment B will be found at the TARGET

LOCATION described in Attachment A.

s/Austin Love

_____

Austin Love, Special Agent
Drug Enforcement Administration

Sworn and subscribed to me telephonically pursuant to Fed. R. Crim. P. 41(d)(3) and Rule

4.1 this _10_ day of October, 2019 at _3:00 pm_ (Central Standard Time).

s/Jonathan E Hawley

HONORABLE JONATHAN E. HAWLEY
UNITED STATES MAGISTRATE JUDGE

18